IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

               Respondent,

      v.

FRANK EDMUND WALTON,

               Appellant.

No. 83538-6-I

DIVISION ONE

ORDER WITHDRAWING AND
SUBSTITUTING OPINION

The court has determined that the opinion filed on February 5, 2024 shall

be withdrawn and a substitute opinion filed.

Now, therefore, it is hereby

ORDERED that the opinion filed on February 5, 2024 shall be withdrawn

and a substitute opinion filed.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>          Respondent,<br><br>      v.<br><br>FRANK EDMUND WALTON,<br><br>          Appellant. | No. 83538-6-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

HAZELRIGG, A.C.J. — Frank Walton appeals convictions for murder in the second degree and tampering with physical evidence, a gross misdemeanor. Walton avers the trial court erred in overruling two of his GR 37 objections to the State's use of peremptory strikes and asserts that those rulings violated the equal protection clause of the Fourteenth Amendment to the United States Constitution. He further challenges the sufficiency of evidence regarding tampering with physical evidence and contends the trial court erred by not issuing a jury instruction on unanimity as to that charge. He also raises a number of issues in a statement of additional grounds for review. Because the trial court misinterpreted GR 37 and erroneously overruled Walton's objections to the State's peremptory challenges, we reverse.

FACTS

On March 28, 2020 at approximately 10 a.m., Howard Benzel left his house in Mukilteo to visit a rental property (Madison building) he owned in Everett. His

wife, Denise Benzel,[1] expected him to be home by 1 p.m. Around 4 p.m., after Howard had neither returned nor called, Denise drove to the Madison building to look for him. When Denise arrived, she saw Howard's truck and noticed his phone and wallet were both inside the vehicle. After discovering the back doors of the Madison building were locked, Denise went to unit 10 which Frank Walton rented. Denise was familiar with Walton and saw his car parked in front of the door to his unit.

Denise knocked on Walton's door and, when he answered, she asked him to unlock the back door so she could see if Howard was inside. She then went around to the back where the door had been unlocked, entered the building and checked all the common areas but did not find Howard. At that point, she returned to her car and began to drive home. After she had driven about three or four blocks Denise decided to turn around, as she "thought something [wa]s terribly wrong." When she returned to the building, Denise noticed "[a] lot of blood spatters on [Walton's] doorstep" and saw Walton leaning down "trying to clean the blood" with "cleaning solution and a rag." She called 911. Denise testified that she then addressed Walton: "what are you doing, are you cleaning up my husband's blood? And [Walton] said no, it was spilled paint . . . [she] said, no, it isn't, that's my husband's blood, you murdered my husband." Walton told her she was "crazy" and proceeded to "thr[o]w the bloody rags," along with two black plastic bags, into his car and drive away. Police officers arrived shortly thereafter.

---

[1] Because they share a last name, we refer to each of the Benzels by their first name for clarity. No disrespect is intended.

Everett Police Department (EPD) Detective Alexander Helphrey testified that when he arrived at the scene, he "observed what appeared to be fresh blood on the concrete outside of the . . . entrance door on the Madison Street side which entered into [u]nits 8 and 10." EPD Officer Jason MacDonald also testified that he saw "blood on the sidewalk" just outside the door and "at least one blood drop out on the roadway." EPD Detective Maiya Atkins explained at trial that there were various articles of clothing with "significant amounts of blood on them" and bags with "Clorox-type wipes"[2] and other cleaning supplies inside of them inside Walton's unit. The bags also contained disposable surgical gloves with what appeared to be blood on them. Atkins further testified that there were garbage bags in the dumpster behind the building filled with cleaning supplies, Lysol,[3] towels, and paper towels stained with cleaning fluid and what was believed to be blood. A forensic specialist from the Washington State Patrol Crime Lab confirmed that there was blood inside Walton's unit which indicated that an assault had taken place there. The blood stains in Walton's unit also indicated that someone had wiped up the blood before it dried completely.

Later that night, officers found Walton in Marysville and detained him for investigation. Walton's vehicle was parked near a dumpster in which officers found what appeared to be the missing passenger floor mat from Walton's car, along with plastic bags containing items with "a lot of blood saturation on them." Officers also found a poster linked to Howard's building with Walton's fingerprints on it. Initially, Walton told the officers that he did not know what happened to Howard, but he

---

[2] A disposable cleaning cloth soaked in disinfectant solution.
[3] A cleaning and disinfecting liquid.

later claimed that "two guys" came into his office "flashing guns and stuff," "punched [Howard] in his head," and took Howard out the front door of Walton's unit. Walton stated that there was blood, which "freaked [him] out," and "that's why [he] didn't really say anything about it." According to Walton, the two individuals were "Hispanic" and he "could definitely tell that they belong[ed] to the cartel."

Two days later, a couple pulled over while traveling on Highway 9 in Skagit County and discovered Howard's dead body about 20 yards off the road. His body was found wrapped in plastic bags. Over a year later, on July 1, 2021, the State charged Walton with one count of murder in the first degree, with a deadly weapon enhancement, and one count of tampering with physical evidence, a gross misdemeanor.

During voir dire, the trial court issued a preliminary ruling on GR 37 where it stated that "the Supreme Court intended the rule to apply *only* when the objection was made to a peremptory challenge of a juror who appears to be a racial or ethnic minority." (Emphasis added.) The trial court found that "it would not be discriminatory to allow a peremptory against a juror who does not appear to be a juror of color." The State used peremptory challenges on two jurors who the court and attorneys perceived as White, juror 22 and juror 38.[4] The prosecutor challenged the jurors as biased against police. The defense objected based on GR 37 and argued that an objective observer could view race as a factor in both challenges based on the answers they had provided to the attorneys' questions.

---

[4] The record contains several statements by the court, prosecutor, and defense counsel articulating their respective beliefs that the jurors were White based on their appearance. At no point did the court or either party directly inquire as to the race of the jurors at issue.

In accordance with its preliminary ruling, the trial court denied both GR 37 objections based on its perception of the race of juror 22 and 38 and granted the State's peremptory challenges.

The jury acquitted Walton of murder in the first degree and did not reach a verdict on the deadly weapon enhancement. He was convicted of the lesser included charge of murder in the second degree and tampering with physical evidence.

Walton timely appealed.

ANALYSIS

I.      Interpretation of Court Rules

Walton assigns error to the trial court's denial of his GR 37 objections concerning jurors 22 and 38 who appeared to the parties and trial court not to be Black, Indigenous, or People of Color (BIPOC). The State argues in briefing that GR 37 is inapposite as that rule "applies only to attempts to remove people of color from juries." Because the trial court's decisions as to these two challenges were based on its preliminary determination that GR 37 only addresses the use of a peremptory challenge against a potential juror who "appears to be a racial or ethnic minority," our analysis begins with the interpretation of the rule.

The meaning of a court rule is a question of law reviewed de novo. *State v. Stump*, 185 Wn.2d 454, 458, 374 P.3d 89 (2016). We interpret court rules in the same manner as we do statutes. *Jafar v. Webb*, 177 Wn.2d 520, 526-27, 303 P.3d 1042 (2013). Our inquiry begins with reading the text of the rule, focusing on its plain language to discern the meaning. *State v. Roggenkamp*, 153 Wn.2d 614,

621, 106 P.3d 196 (2005); *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). Rather than examining the rule's language in isolation, we look at it "in context, considering related provisions, and in light of the statutory or rule-making scheme as a whole." *Stump*, 185 Wn.2d at 460. If only one reasonable interpretation can be derived from the rule, "then it is unambiguous and 'our inquiry ends.'" *State v. Jieta*, 12 Wn. App. 2d 227, 231, 457 P.3d 1209 (2020) (quoting *City of Seattle v. Holifield*, 170 Wn.2d 230, 237, 240 P.3d 1162 (2010)).

An unambiguous rule is "not subject to judicial construction." *State v. Watson*, 146 Wn.2d 947, 955, 51 P.3d 66 (2002). Rather, we assume the drafting body "means exactly what it says" and we "'must not add words where the [drafting body] has chosen not to include them.'" *State v. Keller*, 143 Wn.2d 267, 276, 19 P.3d 1030 (2001); *State v. James-Buhl*, 190 Wn.2d 470, 474, 415 P.3d 234 (2018) (quoting *Rest. Dev., Inc. v. Cananwill, Inc.*, 150 Wn.2d 674, 682, 80 P.3d 598 (2003)). Even if we believe the drafters intended something else but failed to adequately express it, we will not add language to a clear rule unless such an addition is "imperatively required to make the [rule] rational." *Watson*, 146 Wn.2d at 955. When the plain language is unambiguous, we must give it effect. *James-Buhl*, 190 Wn.2d at 474.

However, if the language of a rule remains "amenable to more than one reasonable interpretation, it is deemed to be ambiguous" and our inquiry continues. *Roggenkamp*, 153 Wn.2d at 621. In order to interpret an ambiguous rule, we may "resort to principles of statutory construction,[5] legislative history, and relevant case

---

[5] Courts "construe statutes to avoid constitutional doubt." *Utter ex rel. State v. Bldg. Indus. Ass'n of Wash.*, 182 Wn.2d 398, 434, 341 P.3d 953 (2015).

law." *Watson*, 146 Wn.2d at 955. Accordingly, unless GR 37 is ambiguous, our interpretation is governed by the plain language. *See State v. Sullivan*, 143 Wn.2d 162, 175, 19 P.3d 1012 (2001); *see also Roggenkamp*, 153 Wn.2d at 621; *Watson*, 146 Wn.2d at 954; *Armendariz*, 160 Wn.2d at 110; *State v. Davis*, 3 Wn. App. 2d 763, 788, 418 P.3d 199 (2018).

A. Plain Meaning of GR 37

GR 37 applies in all jury trials and the express "purpose of this rule is to eliminate the unfair exclusion of potential jurors based on race or ethnicity." GR 37(a), (b). A party may raise an objection to a peremptory challenge under GR 37 by simply citing to the rule. GR 37(c). Once an objection is made, the party exercising the peremptory challenge must articulate its reasons for seeking to strike the member of the jury. GR 37(d). GR 37(h) sets out seven presumptively invalid reasons for exercising a peremptory challenge to a juror:

(i) having prior contact with law enforcement officers;

(ii) expressing a distrust of law enforcement or a belief that law enforcement officers engage in racial profiling;

(iii) having a close relationship with people who have been stopped, arrested, or convicted of a crime;

(iv) living in a high-crime neighborhood;

(v) having a child outside of marriage;

(vi) receiving state benefits; and

(vii) not being a native English speaker.[6]

---

[6] According to the State's response brief, "By listing these reasons as presumptively invalid, the Supreme Court directs the trial courts to consider whether an apparently race-neutral reason for challenging a juror is correlated with the *juror's* race." However, nowhere in the plain language

After the party that sought to exercise a peremptory strike provides its reasoning, the court must evaluate those reasons "in light of the totality of circumstances." GR 37(e). "If the court determines that an objective observer *could view race or ethnicity as a factor* in the use of the peremptory challenge, then the peremptory challenge shall be denied." *Id.* (emphasis added). An "objective observer" is explicitly described as someone who "is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State." GR 37(f). GR 37(g) directs that the court "should consider" the following circumstances in making its decision:

(i) the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it;

(ii) whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors;

(iii) whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party;[7]

of the rule does the Supreme Court restrict the trial court's consideration to the race of the challenged juror.

While these presumptively invalid reasons typically come into play when the juror's race or ethnicity could be seen as the reason for the challenge, effectively used as proxies for race, they do not establish that the Supreme Court intended GR 37 to only apply in those situations.

[7] The State avers in briefing that this consideration is "nonsensical" unless the rule only applies to jurors based on *their* race or ethnicity. This is incorrect. Simply because certain provisions of the rule seem to apply only to peremptory challenges based on the race or ethnicity of the challenged juror does not mean that the other provisions do not apply to different circumstances.

Further, while GR 37(g)(iii), specifically, may only be a relevant consideration when a peremptory challenge is exercised on the basis of a juror's race, it does not show that the other provisions of the rule were intended to be limited to those circumstances.

(iv) whether a reason might be disproportionately associated with a race or ethnicity;[8] and

(v) whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases.

Our Supreme Court has explained, "[GR 37(g)] is not a checklist for trial courts to cross off but, instead, factors to be considered in making a determination." *State v. Tesfasilasye*, 200 Wn.2d 345, 358, 518 P.3d 193 (2022).

As GR 37 is clear on its face, this court derives its meaning from the language of the rule itself. *See Keller*, 143 Wn.2d at 276. The explicit purpose of the rule is broad: "to eliminate the unfair exclusion of potential jurors *based on race or ethnicity*." GR 37(a) (emphasis added). It directs trial courts to deny a peremptory challenge if "an objective observer *could view race or ethnicity as a factor* in the use of the peremptory challenge." GR 37(e) (emphasis added). While the State argues that the rule only applies to challenges made against BIPOC jurors, this court will not "insert words into a [rule] where the language, taken as a whole, is clear and unambiguous." *Watson*, 146 Wn.2d at 955. Nowhere in the text of the rule is its application restricted to the race or ethnicity of the challenged juror.

Though the State seems to argue that GR 37(h) and (g) are irrational unless the rule is limited to people of color and, more particularly, the race or ethnicity of the challenged juror, this argument fails to realize that those subsections still

---

[8] The State also emphasizes this consideration within the GR 37 framework, but offers no argument as to how it supports its broader interpretation of the rule. However, for the same reason that GR 37(g)(iii) is not irrational when the rule is applied to all races and ethnicities, neither is this individual factor. Again, simply because the court should consider this question does not mean that it will always be vital or controlling.

further the purpose of the rule when interpreted more broadly, i.e., as written. While our Supreme Court has explained that the seven presumptively invalid reasons under GR 37(h) are "highly correlated 'with race and have been used historically to exclude people of color from jury service,'" that does not show the court intended to confine the entire rule to BIPOC jurors. *Tesfasilasye*, 200 Wn.2d at 358 (quoting PROPOSED NEW GR 37—JURY SELECTION WORKGROUP, FINAL REPORT, app. 2 (2018)). Even if we believed a more restrictive application was intended, we would not augment the unambiguous language of GR 37 because no addition "is imperatively required to make the [rule] rational." *Watson*, 146 Wn.2d at 955. The rule rationally and clearly aims to broadly remove dismissal based on race and ethnicity, including views about the same, from the use of peremptory challenges.

Under its plain language, GR 37 is meant to eliminate the exclusion of jurors on the basis of race or ethnicity and it applies to any peremptory challenge where race or ethnicity could be a factor; this is particularly critical where, as here, the bases for the peremptory challenge would not be acceptable if used against a BIPOC juror. Accordingly, we "'must give effect to that meaning as an expression of [the drafter's] intent.'" *State v. Larson*, 184 Wn.2d 843, 848, 365 P.3d 740 (2015) (internal quotation marks omitted) (quoting *State v. Hirschfelder*, 170 Wn.2d 536, 543, 242 P.3d 876 (2010)).[9]

---

[9] *See also State v. Matamua*, __ Wn. App. 2d __, 539 P.3d 28, 37 (2023) ("It is worth noting that the [trial] court's apparent misunderstanding of GR 37 led the court to this error. Namely, believing that jurors of color were the only 'jurors to which GR 37 *applies*.'")

B.     Equal Protection Clause

Walton contends that the trial court's overruling of his GR 37 objections based on its interpretation that the rule does not apply to jurors of all races and ethnicities was a violation of the equal protection clause of the United States' Constitution.  According to the State, "GR 37 does discriminate based on race" but does not violate equal protection "because it is narrowly tailored to serve a compelling state interest."

The equal protection clause of the Fourteenth Amendment to the federal constitution guarantees all criminal defendants the right to a jury selection process that is free from intentional discrimination.  *Batson v. Kentucky*, 476 U.S. 79, 85-86, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986); *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 140-43, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994).  "The Constitution guarantees that right to every person regardless of [their] background."  *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 299, 98 S. Ct. 2733, 57 L. Ed. 2d 750 (1978).

"Racial classifications are antithetical to the Fourteenth Amendment, whose 'central purpose' was 'to eliminate racial discrimination emanating from official sources in the States.'"  *Shaw v. Hunt,* 517 U.S. 899, 907, 116 S. Ct. 1894, 135 L. Ed. 2d 207 (1996) (quoting *McLaughlin v. Florida*, 379 U.S. 184, 192, 85 S. Ct. 283, 288, 13 L. Ed. 2d 222 (1964)).  Barring exceptional circumstances, a violation of the equal protection clause occurs when a state imposes a discriminatory classification based on race that treats similarly situated individuals differently.  *Darrin v. Gould*, 85 Wn.2d 859, 865, 540 P.2d 882 (1975).  As the United States

Supreme Court has consistently held, "'*all* racial classifications imposed by government . . . must be analyzed by a reviewing court under strict scrutiny.'" *Johnson v. California*, 543 U.S. 499, 505, 125 S. Ct. 1141, 160 L. Ed. 2d 949 (2005) (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995)). "In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Peña,* 515 U.S. at 227.

Because the trial court interpreted the protections of GR 37 as only applicable to racial or ethnic minorities at the exclusion of White people, the classification was race-based and is subject to strict scrutiny. "When strict scrutiny is involved, the classification will be upheld only if the state makes a showing of a compelling state interest to justify the classification." *Gould*, 85 Wn.2d at 865. Thus, the burden is on the State to show that GR 37, as interpreted and applied by the trial court, is narrowly tailored to serve a compelling government interest.

The State asserts that "GR 37 serves the compelling state interest of preventing exclusion of people of color from juries." This may very well constitute a compelling government interest, especially since the Supreme Court has recognized "as a compelling state interest a government's effort to remedy past discrimination for which it is responsible." *Grutter v. Bollinger,* 539 U.S. 306, 351-52, 123 S. Ct. 2325, 156 L. Ed. 2d 304 (2003); *see also Shaw*, 517 U.S. at 909 ("A State's interest in remedying the effects of past or present racial discrimination may in the proper case justify a government's use of racial distinctions.").

However, the State fails in its attempt to demonstrate that GR 37 is narrowly tailored to serve such a purpose. The State must show that there is "no reasonable alternative way" to prevent the exclusion of BIPOC people from juries than to create a different standard for peremptory challenges based on the race of the juror. *See State v. Warren*, 165 Wn.2d 17, 34-35, 195 P.3d 940 (2008). In other words, the racially discriminatory means the State chooses "must be specifically and narrowly framed to accomplish [its] purpose." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280, 106 S. Ct. 1842, 90 L. Ed. 2d 260 (1986) (plurality opinion).

In briefing, the State simply proclaims that "GR 37 is narrowly tailored because it prevents exclusion of jurors based on their race or ethnicity." Pointing to *Batson,* the State notes that "there are avenues for parties to object to biased jurors and to racially discriminatory challenges unrelated to GR 37." This misunderstands the meaning of "narrowly tailored" in the context of strict scrutiny analysis and is insufficient to satisfy the State's burden to meet this appropriately stringent constitutional standard. Thus, not only is the plain meaning of GR 37 at odds with the trial court's interpretation of the rule, but such a racially discriminatory application of the rule is prohibited by the equal protection clause. With this framework, we consider the specific GR 37 challenges at issue.

C.    Denial of GR 37 Objections

We review GR 37 rulings de novo.[10] *State v. Booth*, 22 Wn. App. 2d 565, 571, 510 P.3d 1025 (2022). Standing in the same position as the trial court, we

---

[10] Our Supreme Court has made it clear that there may be circumstances in which de novo review is inappropriate, e.g., if the trial court's ruling is based on factual findings or credibility

must determine whether an "objective observer could view race or ethnicity as a factor" in the State's peremptory challenges to juror 22 and juror 38. GR 37(e); *see also State v. Jefferson*, 192 Wn.2d 225, 249-50, 429 P.3d 467 (2018) (explaining the objective inquiry process). When a trial court grants a peremptory challenge in violation of GR 37, the remedy is reversal of the convictions and remand for a new trial. *State v. Lahman*, 17 Wn. App. 2d 925, 938, 488 P.3d 881 (2021).

During voir dire, the following exchange occurred with juror 22 when the State asked how they felt about police:

> PROSPECTIVE JUROR NO. 22: *Based on the past few years of news and what's happened, it's difficult for me to trust police.*
>
> [STATE]: Tell me more about that. Why?
>
> PROSPECTIVE JUROR NO. 22: *The police brutality that's gone on with the Black Lives Matter, I know it's not every police officer, but there are so many instances that have happened that it makes it difficult for me to trust someone just based on that job but, again, I would say the same thing that goes with lawyers: I'd try not to have any judgments before hearing from a specific person.*
>
> [STATE]: Absolutely, and that's kind of why I wanted to follow that up with you, you being on social media. I mean, we're about the same age, I know it. So we do have police and we have an African American defendant. How does that make you feel?
>
> PROSPECTIVE JUROR NO. 22: In what way?
>
> [STATE]: Any way. Coming in here and seeing that, did you start on one side or the other?
>
> PROSPECTIVE JUROR NO. 22: I—well, I actually just try to push that stuff to the back of my mind and almost start afresh and—yeah, if that makes sense.

---

determinations. *Tesfasilasye*, 200 Wn.2d at 356. However, that is not the case here and thus we apply de novo review. *See State v. Hale*, __ Wn. App. 2d __, 537 P.3d 707, 713 (2023).

[STATE]: Tell me more about that. What do you mean?

PROSPECTIVE JUROR NO. 22: Try to push that bias away and not—yeah, not judge people based on that.

[STATE]: It's prevalent in society. We saw it a lot last year, right, the civil unrest? We can't deny that it exists. What I'm trying to get at here with everyone present, and I'm using you to get this point through, is Mr. Roberson, Dave, talked about Mr. Walton is presumed innocent, right? You agree with that?

PROSPECTIVE JUROR NO. 22: Uh-huh.

[STATE]: Sitting here, he is innocent, and we have the burden of proof as prosecutors of beyond a reasonable doubt, so unless and until you are satisfied beyond a reasonable doubt, he remains innocent. You agree with that?

PROSPECTIVE JUROR NO. 22: Yes.

. . .

[STATE]: With homicide, you tend to assume police will be in charge of the investigation, not a random citizen off the street?

PROSPECTIVE JUROR NO. 22: Yes.

[STATE]: So there could be a lot of law enforcement officers coming in to testify. Would you have any issue listening to what they say to you and taking their testimony and making your own judgments, or would you have this preconceived bias against them?

PROSPECTIVE JUROR NO. 22: *I would not have any issue listening to everything they have to say*.

(Emphasis added.)

When defense counsel raised a GR 37 objection in response to the State's peremptory challenge to juror 22, the State first noted that "it did not appear that [j]uror 22 is a person of minority race or person of color in any way." Again, the record establishes that no one inquired as to the race or ethnicity of the juror at issue but, rather, proceeded based on the perception of others. The State then

explained it was concerned that the juror was biased against police and referenced her "feelings towards things that occurred previously in the last year with the riots and other unrest."

GR 37(h)(ii) provides that "expressing a distrust of law enforcement or a belief that law enforcement officers engage in racial profiling" is a presumptively invalid reason to exercise a peremptory challenge. This "presumption of invalidity is not overcome merely because the State used different language when giving its reasons for using its challenge." *State v. Harrison,* 26 Wn. App. 2d 575, 583, 528 P.3d 849 (2023) (citing *Tesfasilasye*, 200 Wn.2d at 359). Here, the State claimed that the juror's responses showed bias against police,[11] but juror 22's responses showed nothing more than an admitted difficulty trusting law enforcement due to the "police brutality that's gone on with the Black Lives Matter." Further, the State asked juror 22 how she felt about the fact that Walton is African American and that police were involved in the case, to which she responded that she tries to "push that stuff to the back of [her] mind and almost start afresh" and "not judge people based on that." She then confirmed that she would have no issue listening to law enforcement officers testify and would have no "preconceived bias" against them.

---

[11] At oral argument, the State argued that juror 22's "bias against police" came from the form of her media consumption rather than personal experiences, thus GR 37 did not apply. According to the State, "the main reason [for the peremptory challenge] was that the juror got her news from social media and . . . that idea of bias was not from her personal experience but was from the news that she received on social media." Wash. Ct. of Appeals oral argument, *State v. Walton*, No. 83538-6-I (June 1, 2023), at 15 min., 55 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023061081.

However, GR 37(h)(ii) does not require a distrust of law enforcement to be rooted in personal experiences. The rule itself makes no distinction among the various grounds for distrusting law enforcement; whether it be due to social media outlets or first-hand encounters, a juror's distrust of police is a presumptively invalid reason to exercise a peremptory strike under the plain language of the rule. Moreover, the State's assertion, that striking a juror based on their media consumption and sources is proper, is not well taken, and not a road on which this court will travel.

At oral argument before this court, the State seemingly conceded it could not have supported a challenge for cause with juror 22's answers due to the subsequent assurance of not being swayed against the law enforcement witnesses, and being able to set those ideas aside and be fair.[12]  More critically, the State expressly argues in briefing that the impermissible basis set out in GR 37(h)(ii) may only apply to people of color and failing to tie that historical proxy for race-based exclusion to the race of the juror would be "nonsensical."  However, if the proffered reason for a peremptory challenge, views about race, would be improper when used to strike a BIPOC juror, it remains an unacceptable reason to strike a White person based on the equal protection clause.  *See Gould*, 85 Wn.2d at 865.  Based on the totality of the circumstances, including the clear rehabilitation and lack of any basis to support a challenge for cause, an objective observer could view race as a factor in the State's peremptory challenge of this juror who expressed a distrust of law enforcement based on concerns about racism in policing, specifically police brutality surrounding the Black Lives Matter movement.  The fact that Walton is a Black man centered those perspectives in a way that may not have occurred if the accused was a White person.[13]

---

[12] Wash. Ct. of Appeals oral argument, *supra*, at 16 min., 38 sec.

[13] The State intentionally focused on this particular dynamic in its questioning of juror 22 when it asked, "So, we do have police and we have an African American defendant.  How does that make you feel?"  The State's explanation offered on appeal about its framing of the challenge to juror 22 strengthens the conclusion that the race of the accused could have been a factor therein.

When asked at oral argument whether the State would have made these peremptory challenges if the defendant was White, the attorney for the State responded that they "can't say about juror 22 as the reading did seem to be associated with juror 22's views on police themselves and their dealings with people of color."  Wash. Ct. of Appeals oral argument, *supra*, at 17 min. 46 sec.

Under GR 37 h(ii), the State's reasoning for this challenge was presumptively invalid and it remains so regardless of the color of the juror; Walton is a Black man and the juror expressed a distrust of police based on the "*police brutality that's gone on with the Black Lives Matter.*" (Emphasis added.)

Later, the State questioned juror 38 after they raised their hand signifying that they were comfortable sitting on the jury for a murder trial. The following exchange occurred:

PROSPECTIVE JUROR NO. 38: I'm kind of into true crime, so I'm pretty familiar with this kind of stuff.

[STATE]: What do you mean by that?

PROSPECTIVE JUROR NO. 38: I just watch a lot of true crime, court videos so, you know, it will be different when I'm actually involved, I'm sure, but I've seen a lot.

[STATE]: What kind of true crime shows do you watch?

PROSPECTIVE JUROR NO. 38: I watch a couple different YouTubers,[14] that chapter—Bailey Sarian and Coffeehouse Crimes. They are all YouTubers that go over true crime.

[STATE]: Your knowledge of that, do you think you would bring that in and insert it into this trial?

PROSPECTIVE JUROR NO. 38: I mean, as far as what?

[STATE]: Let's say as hearing a process through the YouTube that the police tend to do X, Y, and Z. We didn't hear that in this trial, but I'm going to assume that happened here because of my knowledge from YouTube.
PROSPECTIVE JUROR NO. 38: No.

[STATE]: So your outside information, will you be able to put that aside and only focus on what happens in these four walls?

PROSPECTIVE JUROR NO. 38: Yeah. Every scenario in a YouTube trial will be different from—I assume this will be different from every trial I watched online.

[STATE]: It's kind of an uncomfortable question, but I think it needs to be discussed. Are you aware of the civil unrest that happened over the last year, year and a half?

PROSPECTIVE JUROR NO. 38: Yes.

---

[14] A "YouTuber" is a person who creates or appears in videos on the video-sharing website YouTube.

[STATE]: Are you aware of the pervasive issue in the criminal justice system with African Americans?[15]

PROSPECTIVE JUROR NO. 38: Yes.

[STATE]: What are your feelings about that?
PROSPECTIVE JUROR NO. 38: *I agree with [j]uror 58 that people of color have been unjustly treated by the American justice system, and I feel like it's really important for me to acknowledge any bias that I might have as a [W]hite person when things come to light.*

[STATE]: So as you can see, we have an African American man on trial, accused, and we have Detective Helphrey here, and you heard from the Judge, a number of law enforcement officers. What were your thoughts when you first heard the list of officers and saw Mr. Walton?

PROSPECTIVE JUROR NO. 38: There were a lot of names, so I really didn't think too much about the names. I wasn't really even sure who was on trial until you started talking, and then I was, like, okay, it's not him, it's not the other guy, okay, so I didn't realize who was on trial until, you know, once you came up and started asking us questions (indicating).

[STATE]: When Mr. Roberson came up?

PROSPECTIVE JUROR NO. 38: Yes.

[STATE]: Now that you know who's on trial, do you have any concerns based on the pervasive problem that does exist?

PROSPECTIVE JUROR NO. 38: I think that's going to be something I keep at the forefront of my mind, make sure that I'm not dealing with any unconscious biases here that might make me feel one way or the other.

[STATE]: What about hearing from police officers, their testimony? Do you have any type of bias where you start in a position of distrust and that they have to earn your trust?

PROSPECTIVE JUROR NO. 38: I think anyone needs to earn my trust. Not necessarily everyone is, you know, trustworthy. Everyone is at a neutral station when they come to me. You either earn my trust or distrust. It's not a matter of them being less trustworthy than the average person; everyone comes to me with a blank slate.

---

[15] The State fails to ever precisely articulate to which "pervasive issue" it was referring.

- 19 -

[STATE]: Whether someone that works at McDonald's or a 28-year police veteran, are you saying you would start from the same position in the same type of testimony?

PROSPECTIVE JUROR NO. 38: *Yes*.

(Emphasis added.)  In response to Walton's GR 37 objection to its peremptory challenge against juror 38, the State reasoned that it was concerned the juror was "a little more opinionated" and "would not be able to get along with other jurors." The State also noted the juror's interest in true crime and asserted that "[they] didn't indicate [they] know[] that perhaps what [they] see[] on YouTube is not the same thing as the real thing, so I'm concerned with [their] bringing any of that outside knowledge into this case."[16]  This runs directly contrary to juror 38's responses wherein they acknowledged the difference between watching true crime and actually being involved in a trial, noted that they would not bring outside knowledge into the trial, and confirmed that they would be able to put aside their true crime knowledge and focus only on what happened at trial.

The State also noted that juror 38 "did specifically say that [they would] have to keep race at the forefront of [their] mind though [they] would try to push it down and, your Honor, [they are] not a member of a minority community."[17]  It is unclear what the State was attempting to convey in this regard, but that reference weighs in favor of the determination that an objective observer could view race as a factor

---

[16] This reasoning was reiterated by the State at oral argument before this court.  Wash. Ct. of Appeals oral argument, *supra*, at 16 min., 45 sec.

[17] The record clearly establishes that juror 38 used they/them pronouns which the State did not use in this quoted exchange.  We have altered the quote only to the extent that it properly reflects juror 38's self-identified pronouns.

Again, there is no indication in the record that any party inquired of juror 38 about their race or ethnicity, so the basis for the State's assertion that they are "not a member of a minority community" is unclear.

in the State's peremptory challenge. Further, the State insisted that the juror "would present with a bias against the police in this matter."[18] As our Supreme Court has explained, "If a juror can be excused for cause, they should be excused for cause. Biased jurors simply should not be seated." *Tesfasilasye*, 200 Wn.2d at 359. Unlike juror 22, juror 38 never expressly stated a bias against police, but rather acknowledged their awareness of what the State phrased as "the pervasive issue in the criminal justice system with African Americans" and followed up the State's question by explicitly stating that "people of color have been unjustly treated by the American justice system." The "American justice system" could certainly include law enforcement officers, but may have been limited to courts in particular; it is not entirely clear from the record how juror 38 would define the "American justice system." More critically, this is simply an acknowledgement of the same history expressly noted in the plain language of GR 37. Further, the State asked, "Whether someone that works at McDonald's or a 28-year police veteran, are you saying you would start from the same position in the same type of testimony?" and juror 38 replied simply, "Yes." There was no rehabilitation, nor was any necessary, because there was never an expression of bias. Juror 38 explained that everyone has a "blank slate" and needs to "earn [their] trust or distrust." Considering the totality of the circumstances, especially the juror's expressed awareness of the "pervasive issue in the criminal justice system with

---

[18] At oral argument, we asked the State about the fact that neither juror 22 nor juror 38 were challenged for cause, as the basis offered in the trial court for the State's peremptory challenges to both jurors was "bias against police." Directly contradicting the record, the State answered, "the State offered several reasons for striking those jurors, it was *not* bias against police, your honor." Wash. Ct. of Appeals oral argument, *supra*, at 15 min., 20 sec. (emphasis added).

African Americans" and belief that "people of color had been unfairly treated by the American justice system," along with the reasons articulated by the State on appeal that were completely unsupported by the record, an objective observer could view race as a factor in this challenge. Again, this exchange would fail the test set out in GR 37 if it involved a BIPOC juror, so it was improper as to juror 38 based on principles of equal protection.

Consequently, the trial court erred when it denied the defense objections based on GR 37 and granted the State's peremptory challenges to both jurors 22 and 38. The remedy for a GR 37 violation is reversal of the conviction. *Tesfasilasye*, 200 Wn.2d at 362.

## II. Tampering with Physical Evidence

Walton was convicted of the gross misdemeanor crime of tampering with physical evidence and he raises both sufficiency and unanimity challenges as to that count. Despite our reversal on the GR 37 challenge, we reach these assignments of error in the event the State elects to retry Walton, as they are capable of repetition.

### A. Sufficiency of the Evidence

Specifically, Walton contends the State failed to prove one of the statutory elements of the charge: that he had reason to believe an official proceeding was pending or about to be instituted before he tampered with physical evidence. On a challenge to the sufficiency of evidence in a criminal case, we assume the truth of the State's evidence and view it in the light most favorable to the State to

determine whether "any rational trier of fact" could find the defendant guilty beyond a reasonable doubt. *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). All reasonable inferences from the evidence are drawn in favor of the State and "interpreted most strongly against the defendant." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

The "to convict" instruction provided to the jury, which tracked the statutory elements of the crime under RCW 9A.72.150, required the State to prove beyond a reasonable doubt:

> (1) That on or about the 28th day of March, 2020, the defendant destroyed, mutilated, concealed, removed or altered physical evidence;
>
> (2) The defendant had reason to believe an official proceeding was pending or was about to be instituted;
>
> (3) The defendant acted with intent to impair the evidence's appearance, character or availability in such pending or prospective official proceeding;
>
> (4) The defendant acted without legal right or authority; and
>
> (5) That any of these acts occurred in the State of Washington.

While it does not appear from the record that the jury was provided an instruction on the meaning of "official proceeding," RCW 9A.72.010(4) defines the phrase as, "a proceeding heard before any legislative, judicial, administrative, or other government agency or official authorized to hear evidence under oath, including any referee, hearing examiner, commissioner, notary, or other person taking testimony or depositions."

Viewed in the light most favorable to the State, sufficient evidence was introduced at trial to support a conviction for this gross misdemeanor charge.

- 23 -

Denise testified that she saw Walton cleaning up blood from the ground outside of his unit and said to him, "You murdered my husband." Investigating officers found Howard's blood within Walton's unit and discovered a garbage bag that contained cleaning supplies, surgical gloves, clothes, and shoes, all of which had blood on them. The nature of the blood stains in Walton's unit indicated that someone had attempted to clean up the blood before it had dried. There were garbage bags found in a dumpster near Walton's unit that contained cleaning supplies and blood as well. When Walton was eventually detained by officers in Marysville, his vehicle was parked near a dumpster in which officers found what appeared to be the missing passenger floor mat from Walton's car along with plastic bags that contained items with "a lot of blood saturation on them." In that same dumpster, officers also found a poster with Walton's fingerprints on it that matched the posters inside his unit. Further, on the afternoon Howard went missing, Walton met with his friends, Marcus Harvey and "Diego,"[19] and asked Harvey to say that they had been playing basketball earlier that day. Diego then pulled some black garbage bags out of Walton's car and put them into the trunk of Harvey's car. According to Harvey, Diego told him "there was some personal belongings [inside the bags] and that he needed to go drop them off somewhere." Shortly after, Walton drove to Skagit County and Harvey followed him in another car. When Walton stopped in a rural area on a one-way road with a "cut-out" where cars could pull over, Harvey felt things were "getting weird" and decided to turn around and go home. However, Diego, who was in Harvey's car, told Harvey to stop at two separate locations

---

[19] Harvey's friend "Diego" did not testify at trial.

where Diego got out of the car and removed the black plastic garbage bags he had placed there earlier. Howard's body was discovered with black plastic covering his head which matched the material of the garbage bags that were found at the dumpster near Walton's unit as well as in the dumpster in Marysville where Walton was detained.

In briefing and at oral argument, Walton only challenged the sufficiency of the evidence as to whether he had reason to believe an official proceeding was pending or was about to be instituted when he tampered with physical evidence.[20] Specifically, Walton argues that because he was not under arrest or the target of a police investigation when he allegedly tampered with the physical evidence, he "could not have had reason to believe a proceeding would be initiated in relation to the evidence he allegedly destroyed, mutilated, or concealed." Walton's argument erroneously assumes that the State can only prove this element when a defendant is already under arrest or investigation for a specific crime and then tampers with physical evidence in relation to that crime.

Walton's contention rests on an unpublished and distinguishable case, *State v. Edwards*, in which Division Two of this court interpreted RCW 9A.72.150 to require that the prospective proceeding must relate to the physical evidence the defendant tampered with.[21] Police officers responded to a call that Edwards was fighting and arrested him on an outstanding warrant from an unrelated matter. *State v. Edwards,* No. 46469-1-II, slip op. at 1 (Wash. Ct. App. July 7, 2015) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2046469-1-II%20%20

---

[20] Wash. Ct. of Appeals oral argument, *supra*, at 5 min., 30 sec.
[21] The unpublished opinion is cited by Walton as persuasive authority pursuant to GR 14.1.

Unpublished%20Opinion.pdf. While processing Edwards at the jail, a corrections officer noticed Edwards' hand on his mouth and told him to remove it. *Id.* at 2. When he did so, a small oxycodone pill fell to the floor and the officer retrieved it. *Id.* The State then charged Edwards with unlawful possession of a controlled substance and one count of tampering with physical evidence. *Id.* The court reversed the conviction for tampering because "Edwards was arrested on an unrelated outstanding warrant" and, until the officer retrieved the oxycodone pill from the ground, "Edwards could not have had reason to believe that a proceeding would be initiated for unlawful possession of a controlled substance." *Id.* at 3.

Unlike Edwards who was charged with tampering with physical evidence that was completely unrelated to the crime for which he was arrested, Walton was convicted of tampering with the physical evidence that was directly linked to the murder for which he was investigated, arrested, and ultimately charged. More importantly, Edwards was convicted of possession of a controlled substance based on the possession of one pill that he dropped in front of an officer, and the State conceded that there was insufficient evidence to support the count of tampering with physical evidence based on that momentary circumstance. *Id.* at 2. Walton, however, was convicted of murder in the second degree and tampering with physical evidence in relation to the same underlying crime based on a continuing course of conduct throughout the day as he cleaned the blood, threw away the cleaning supplies, transported physical evidence away from the crime scene, and requested his friends lie about his whereabouts.

Although Walton may not have been under arrest or identified by police as a suspect at the time he tampered with the physical evidence related to Howard's murder, a reasonable juror could find that he was still aware that an official proceeding, specifically a criminal investigation, would be initiated. Shortly after Howard's murder, while Walton was in the process of cleaning Howard's blood, Denise confronted Walton and accused him of murdering her husband. Under the circumstances, her assertion was sufficient for Walton to believe that an official proceeding would be forthcoming; whether it was coming at that moment or once Denise repeated those words to law enforcement is immaterial.[22] Walton's arguments to the contrary ignore the reality of the situation and the lens through which we view the evidence when considering a sufficiency challenge. Assuming the truth of the State's evidence on this charge, a rational juror could find beyond a reasonable doubt that Walton tampered with physical evidence at a time when he had reason to believe that an official proceeding would be instituted.

B.    Unanimity Instruction

Walton next argues that the trial court erred by failing to provide a jury instruction on unanimity for the gross misdemeanor charge of tampering with physical evidence. Whether a unanimity instruction was required is a question of law that we review de novo. *State v. Lee*, 12 Wn. App. 2d 378, 393, 460 P.3d 701 (2020).

---

[22] At oral argument, defense counsel maintained that such a statement was not enough to put someone on notice that an official proceeding was likely forthcoming. Wash. Court of Appeals oral argument, *supra*, at 6 min., 20 sec. Under these facts, we plainly disagree.

Criminal defendants have the right to a unanimous jury verdict. *State v. Armstrong*, 188 Wn.2d 333, 340, 394 P.3d 373 (2017) (citing WASH. CONST. art. I, § 21). When several acts are alleged that could each support a conviction, either the State must "elect the act upon which it will rely for conviction or the court must instruct the jury that it must unanimously agree that one particular act was proved beyond a reasonable doubt." *State v. Moultrie*, 143 Wn. App. 387, 392, 177 P.3d 776 (2008). However, no election nor unanimity instruction is required if the crime involves a "continuing course of conduct." *State v. Crane*, 116 Wn.2d 315, 326, 804 P.2d 10 (1991). To determine whether there is a "continuing course of conduct," the facts of the case are to be analyzed in a "'commonsense manner.'" *State v. Christian*, 18 Wn. App. 2d 185, 208, 489 P.3d 657 (quoting *State v. Rodriguez*, 187 Wn. App. 922, 937, 352 P.3d 200 (2015), *review denied*, 184 Wn.2d 1011 (2021). A variety of factors are considered, including whether the defendant committed the alleged acts within "'a small time frame' and as part of a single, overarching criminal act." *In re Pers. Restraint of Mulamba*, 199 Wn.2d 488, 508, 508 P.3d 645 (2022) (quoting *Crane*, 116 Wn.2d at 330).

At closing argument, the State pointed to evidence of four incriminating acts performed by Walton, including "cleaning up", "put[ting] things in the dumpster," "conceal[ing] the body" and "clean[ing] up the blood in the unit." Walton claims a unanimity instruction was required here as any one of those actions could have independently supported a conviction on that count. We disagree. All of Walton's various acts regarding cleaning the scene or disposing of materials took place within the hours immediately after Howard's murder. During this limited window of

- 28 -

time, the evidence shows Walton cleaned up, put things in a dumpster, concealed the body, and washed away blood. Common sense leads to the conclusion that Walton took these actions for the singular purpose of making it more difficult for law enforcement to locate the evidence or otherwise connect him to the crime. Because his actions took place in a brief timeframe as part of an overarching criminal act, they constitute a continuing course of conduct, and accordingly, the trial court did not err in not issuing a unanimity instruction.

III.     Statement of Additional Grounds for Review

Walton's statement of additional grounds for review (SAG) opens with an express request for the "Appellate Court to reweigh the controvertible evidence from the defendant's trial." Such an act is clearly outside the scope of our review. Appellate courts "cannot reweigh the evidence on review." *State v. Ramos*, 187 Wn.2d 420, 453, 387 P.3d 650 (2017). Walton ultimately raises a number of additional issues, spanning from due process claims to discovery violations, evidentiary issues and instructional error. Because we reverse on the misapplication of GR 37, we need not reach the assignments of error in Walton's SAG and, should the State elect to retry him, he is free to raise any arguments contained therein on remand.

Reversed and remanded.

WE CONCUR:

- 29