IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 87199-4-I |
| Respondent, | DIVISION ONE |
| v. | |
| DAA MU LOREN JAMAL WINDOM, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, J. — The State charged Windom with assault in the third degree for spitting on a law enforcement officer. During voir dire, Windom's counsel moved to strike a White juror and the State objected under GR 37. The court sustained the State's objection. During closing arguments, the State repeatedly referenced Windom's anger during the incident. The jury found Windom guilty and the court sentenced him to no confinement and 12 months community custody. Windom appealed contending (1) the trial court erred when it sustained the State's GR 37 objection, (2) the prosecutor engaged in race-based misconduct, and (3) the court erroneously admitted prejudicial propensity evidence.

While we do conclude the trial court erred when it sustained the State's GR 37 objection, the error was harmless and, therefore, reversal is not required. We find Windom's other arguments without merit. Accordingly, we affirm.

FACTS

Background

On April 15, 2022, the Snohomish County Police Department received a report of an assault in a parking lot in Everett, Washington. The Department dispatched Deputy Jose Perez, who arrived on the scene and observed a male and female arguing. Both the male, later identified as Daa Mu Loren Jamal Windom, and the female, identified as Kincayde Thornton, had their hands up and were yelling. Windom and Thornton were about six feet apart. Deputy Perez heard Windom yell something along the lines of "[b]itch, I['m] going to fuck you up." Deputy Perez yelled at Windom multiple times to stop, but Windom continued to advance toward Thornton.

Concerned that an assault was about to occur, Deputy Perez intervened and placed himself between Windom and Thornton. Windom continued to advance toward Thornton, saying, "fuck that bitch" and, "she's going to get it." After directing Windom to stop four more times, to no avail, Deputy Perez handcuffed Windom. Windom continued to yell and curse and actively tried to pull away from Deputy Perez. Additional deputies arrived on scene and put Windom in the back of a patrol car. Deputy Perez advised Windom that he was under arrest for assault in the fourth degree. Inside the vehicle, Windom continued to yell and started banging his head on the window. Deputy Perez opened the door and advised him to stop, but Windom responded with profanity and told Deputy Perez to shut the door.

While in transit to the Snohomish County jail, Windom continued to kick at the window of Deputy Perez's vehicle. Concerned that Windom was going to break the window, Deputy Perez stopped the car. Deputy Jacob Olson and Deputy Art Wallin arrived to assist. Deputy Perez rolled down the back window and advised Windom that if he did not stop kicking, he would be put in a hobble.[1] Windom continued to yell, telling Deputy Perez he would continue to kick once the door was closed. Deputy Olson and Deputy Wallin assisted Deputy Perez to put a hobble on Windom.

The rear window near Windom was still halfway open, and Windom put his face near the window and spit on Deputy Olson. Deputy Perez heard Windom make a "hawking sound" and then heard Deputy Olson say, "He spit on me." Deputy Perez told Windom to stop, but Windom continued to spit inside the vehicle (at least eight times) and yell at the deputies. Deputy Perez placed a spit hood on Windom to prevent him from spitting in the car. Deputy Perez drove Windom to the jail, and the State charged Windom with assault in the third degree for spitting on Deputy Olson's face.

Jury Selection

Before trial, Windom's counsel moved the court to exclude testimony from Deputy Perez that he heard Windom spit on Deputy Olson. Windom's counsel claimed the evidence was not relevant and was unfairly prejudicial. The court

---

[1] A hobble is a device attached to a person's ankles and secured to the inside of a car to prevent that person from lifting their legs.

denied the motion, stating it was relevant to indicate intent and absence of mistake.

Voir dire began with 45 potential jurors. The court asked general questions of the jurors, including, "Are any of you personally connected in any way with the courts, the prosecutor['s] office, the public defender['s] office, a private law firm, or a law enforcement agency?" Juror 13 indicated they worked for the Seattle Police Department but stated they did not believe their experience would affect their ability to be fair and impartial. When juror 18 stated their sister and mother worked for local law enforcement agencies, the court asked if "anything about your conversations with your sister or with your mother about the justice system or their employment . . . would make you hesitant or think you might not be able to be fair and impartial?" Juror 18 replied, "I'm not sure I can guarantee that." Later, juror 18 told the court, "[T]he longer I've sat here and the more I've listened, I don't think I could be impartial, given conversations that I have had with family members."

Juror 12 also raised their hand and told the court they were a member of the Edmonds Fire Department, a reserve officer with the Edmonds Police Department, and their son worked at the King County Jail. When asked if any of their experiences might make them unable to be fair and impartial, juror 12 replied, "Not at all." Neither Windom's counsel nor the State asked any additional questions of juror 12.

Windom's counsel addressed the jurors and stated, "I want to jump right to the obvious thing about this case – you know, at the start of it, which is my client

is a Black man, and there's no Black people in this panel. Right? Is anybody Black here? No? Okay." Windom's counsel asked several questions of the jurors concerning race and their ability to remain impartial and give Windom a fair trial. Juror 12 was not one of the jurors questioned individually.

Using peremptory challenges, Windom's counsel moved to strike jurors 13, 1, 12, 18, and 11. The State challenged juror 12's removal, citing GR 37. The court cleared the courtroom, isolating juror 12 in the jury deliberation room from the rest of the jury pool, and the parties discussed the validity of the GR 37 challenge. The State claimed GR 37 is a race neutral law and one of the reasons GR 37 can be invoked is when a juror is excused because they have had prior contact with law enforcement. The State noted that Windom's counsel excused juror 12—a retired fire commissioner and reserve officer—without asking any questions and, therefore, there could be no other reason for Windom's counsel's motion to strike juror 12.

Windom's counsel countered that he had struck the juror because "in this morning's earlier session, as well as during questions, it appeared to me that juror 12 was sleeping." Windom's counsel also noted juror 12 was "not particularly forthcoming in questions posed to the entire panel" and he did not believe juror 12 would "be a suitable juror." The State claimed these were presumptively invalid reasons under GR 37.

The court then conducted a GR 37 analysis and determined an objective observer could view race as a factor in Windom's counsel's use of his peremptory challenge against juror 12.

5

First, the court asked Windom's counsel for his reason for striking juror 12. Windom stated,

> I surmised, based on my observations of Juror No. 12 in this morning's earlier session, as well as during questions, it appeared to me that Juror No. 12 was sleeping. . . . And I also would note that [they were] not particularly forthcoming in questions posed to the entire panel, so I did not feel [they were] going to be a suitable juror in this instance.

The court noted that juror 12 answered all the questions it posed to them, and neither party followed up. The court also noted that juror 13—a juror that Windom's counsel had successfully used a peremptory challenge on—was also not particularly forthcoming in their responses.

When the court asked Windom's counsel to address GR 37(i) (stating that allegations that a juror was sleeping or inattentive have historically been associated with improper discrimination), Windom's counsel pointed out that juror 12 was White and "among many in the panel of a similar nature, both in terms of race, gender, as well as age." Windom's counsel also noted that sleeping was not the only reason he gave. The court asked Windom's counsel if the other reason was because juror 12 was former law enforcement, to which Windom's counsel replied, "No. The other reason I provided was he did not participate in my questioning of the entire panel." The court then asked if the same could be said of juror 13, and Windom's counsel said "yeah."

Ultimately, the court concluded that inattentiveness was a presumptively invalid reason under GR 37, and Windom's counsel was required to bring it to the attention of the court. Because Windom's counsel failed to provide reasonable

6

notice to the court, and neither the court nor opposing counsel could corroborate the behavior, the court upheld the State's GR 37 challenge and juror 12 was impaneled.

Trial

Deputy Perez, Deputy Olson, Deputy Wallin, and Windom all testified at trial. During Deputy Perez's testimony, the court asked the jury to step out. The court expressed to the parties that it had been watching juror 12 carefully and he "appears to be leaning back and has [their] eyes closed for quite some time." The court noted it was worried that juror 12 was having difficulty paying attention and it wanted to call the juror in for questioning. The bailiff brought juror 12 back into the courtroom and the court asked if they were having difficulty staying awake. Juror 12 stated they were not having trouble staying awake and they did not "need to watch the attorney." Juror 12 was brought back to the jury room and trial continued.

Windom testified in his own defense. Windom testified that Thornton initiated the altercation when she hit him with a crowbar. Windom stated he was walking away from the area when Deputy Perez arrived. He said he tried to tell Deputy Perez what was happening, but Thornton kept yelling at him, and he could not get his story out. Windom testified he started yelling back at Thornton and that is when Deputy Perez put him in handcuffs. Windom said he complied and waited in the back of the car while Deputy Perez investigated the scene.

Windom testified that it was when Deputy Perez came back and told him that he was under arrest that he became "very angry." Windom noted he was

7

"enraged" and was yelling at the Deputy Perez. He stated that he was mad enough that he was trying to kick out the window in the back of the patrol car. When asked if he felt good about the way he spoke to the officers, Windom said "yes" because "they didn't do their investigation right" and he had good reason to yell at the officers the way he did. Windom maintained that he did not spit on Officer Olson.

During closing arguments, the State emphasized that for the jury to convict Windom of assault, it needed to find that the spitting was intentional. The State noted the jury could find intentionality from Windom's actions and words. The State went on to discuss witness credibility, maintaining the case came down to "different witnesses saying different things" and it was up to the jurors to be the judges of credibility of each witness. When the State contended the deputies "testified truthfully," Windom's counsel objected and the court sustained the objection. The State rephrased and said, "It's the State's contention . . . that based on [the deputies'] testimony, it was truthful."

The State discussed Windom's testimony, noting "Windom got up there and said a lot of things, and he said a lot of things that just are not true." Windom's counsel objected, but the court overruled, stating it was argument. The State went on to say Windom believed he did not do anything wrong because his actions were justified "because he was angry." The State concluded by telling the jurors,

> You know the surrounding circumstances; that he was angry; he was enraged; he was getting angrier. The hobble made him upset. The spit mask made him upset. Everything rose the

anger level higher and higher. But apparently he was entirely calm in between the time of whatever happened on that video and the deputy arriving and getting arrested. That was the calm period. He was a hurricane and that was the eye of the storm.

It's not believable or reasonable. It is not—it's—essentially, it's a lie, is what it is. He's not telling the truth and he has a motive for that.

The jury found Windom guilty of assault in the third degree.

Following trial, Windom moved for a new trial on multiple grounds, including claims that the trial court erred as a matter of law by sustaining the State's GR 37 challenge, and the State engaged in misconduct during closing arguments. During the hearing, the court and the parties again engaged in a discussion concerning the application of GR 37. Windom's counsel alleged the GR 37 challenge should fail because the State could not get past the initial step of identifying a cognizable racial group: "I don't think there would be much debate with me saying that the purpose of GR 37 is not to protect the majority racial group." The court maintained "a cognizable racial group can also apply to Caucasians," and Windom's counsel had not presented valid reasons for striking juror 12. The court concluded, "I think that based upon the totality of the circumstances throughout the jury selection process, and the fact that juror 12 had the background of what would be presumptively invalid reason as a former law enforcement officer, I am not going to grant the motion for the new trial on the basis of the GR 37 challenge."

As to the prosecutorial misconduct claim, the court noted that, in totality, the State's argument was referencing Windom's testimony that he did not spit and how, in conjunction with all reasonable inferences, it was a lie. The court

9

concluded the State did not "comment on the credibility of a witness or give an opinion that a witness is a liar as to its character." The court denied Windom's motion for a new trial. Windom appealed.

ANALYSIS

GR 37

Windom contends the trial court erred when it concluded a reasonable observer could have viewed race as a factor in Windom's counsel's challenge of juror 12. The State claims Windom's counsel framed voir dire through a racial lens and cited an invalid reason for a strike under GR 37. We conclude the trial court erred when it sustained the State's GR 37 challenge, but the error was harmless.

We review a trial court's ruling on a GR 37 challenge de novo. *State v. Bell*, 5 Wn.3d 54, 64, 571 P.3d 272 (2025). "When a trial court grants a peremptory challenge in violation of GR 37, the remedy is reversal of the convictions and remand for a new trial." *State v. Walton*, 29 Wn. App. 2d 789, 803, 542 P.3d 1041, *review denied*, 3 Wn.3d 1025 (2024). But, when a juror has been erroneously empaneled because of a GR 37 challenge, the harmless error analysis applies. *State v. Booth*, 22 Wn. App. 2d 565, 584, 510 P.3d 1025 (2022). This is because "erroneous denial of a peremptory challenge merely results in 'the improper seating of a competent and unbiased juror.' " *Booth*, 22 Wn. App. 2d at 584 (quoting *Rivera v. Illinois*, 556 U.S. 148, 162, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009)). Accordingly, a party denied their peremptory

challenge is "unlikely to suffer prejudice from an unfair trial." *Booth*, 22 Wn. App. 2d at 584.

GR 37 is a "court rule . . . developed to 'eliminate the unfair exclusion of potential jurors based on race or ethnicity.' " *Bell*, 5 Wn.3d at 66 (quoting GR 37(a)). The rule applies to all jury trials. GR 37(b). Under GR 37, any party or the court "may object to the use of a peremptory challenge to raise the issue of improper bias." GR 37(c). After a simple objection citing GR 37, the court will conduct further discussions outside of the presence of the jury. GR 37(c). Once outside the presence of the jury, the party exercising the peremptory challenge must provide the reasons why the peremptory challenge was exercised. GR 37(d). After the party articulates its reason for using the peremptory challenge, the court evaluates the reasons "in light of the totality of circumstances." GR 37(e). The court must determine whether "an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge." GR 37(e). If the court answers in the affirmative, the challenge shall be denied.

In making its determination, the court should consider, at a minimum, the following circumstances:

> (i) the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it;
>
> (ii) whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors;

(iii) whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party;

(iv) whether a reason might be disproportionately associated with a race or ethnicity; and

(v) whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases.

GR 37(g).

In addition to the circumstances under section (g), the rule identifies several justifications for a peremptory challenge that have historically "been associated with improper discrimination in jury selection" and are presumptively invalid. GR 37(h). These reasons include "having prior contact with law enforcement officers" and "expressing a distrust of law enforcement or a belief that law enforcement officers engage in racial profiling." GR 37(h)(i), (ii).

GR 37 also lists conduct of potential jurors that has historically been associated with improper discrimination, including "allegations that the prospective juror was sleeping, inattentive, or staring or failing to make eye contact." GR 37(i). If a party intends to offer one of these reasons as justification for its peremptory challenge, "that party must provide reasonable notice to the court and the other parties so the behavior can be verified and addressed in a timely manner." GR 37(i). If either the judge or opposing counsel cannot corroborate the behavior, the reason shall be considered invalid. GR 37(i).

First, we address the trial court's statements during Windom's motion for a new trial. In response to Windom's claim that an objective observer could not have viewed race as a basis for its peremptory strike, the court stated,

> [H]ow could an objective observer not think that race was a basis when, at the beginning of your comments to the entire jury, you asked outright, is anyone here Black? It was about race. The entire jury selection, in my mind, seemed to be somewhat focused on race.
>
> I think it was a legitimate trial strategy to do that, but given that overtone and the then-striking of this juror, and also the commentary during the strike where you indicated that there were plenty of white men on the jury, how could—how wouldn't an objective observer conclude race was part of it?

We disagree with the trial court that addressing implicit bias during voir dire creates an "overtone" of race, leading to a GR 37 issue. One of the central purposes of voir dire is that it "provides an opportunity for the court and counsel to examine members of the venire for impartiality." *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 220, 137 S. Ct. 855, 197 L. Ed. 2d 107 (2017). It would be contrary to this determination if every time a defendant raised the issue of race during voir dire, their peremptory challenges could be objected to under GR 37.

While we disagree that discussing race during voir dire raises a GR 37 issue, we agree with the trial court that GR 37(i) was implicated when Windom's counsel provided a reason for his strike that has historically been associated with improper discrimination. But we do not find that under the totality of the circumstances, an objective observer could view race or ethnicity as a factor in Windom's counsel's use of the peremptory challenge against juror 12.

First, it is important to note that, contrary to the Court's and the State's assertion, it is not presumptively invalid under GR 37 to use a peremptory challenge to strike a law enforcement officer. The rule states "*having prior contact* with law enforcement officers" is a presumptively invalid reason for a

13

peremptory challenge; it does not indicate *being* a law enforcement officer is an invalid reason. GR 37(h)(i) (emphasis added). In addition, the remaining presumptively invalid reasons contained in section (h) reflect that the prior contact with law enforcement referenced is that of a juror having contact with law enforcement in an official capacity, rather than having been an officer or having family or friends that are officers. *E.g.*, GR 37(h)(ii) ("[E]xpressing a distrust of law enforcement or a belief that law enforcement officers engage in racial profiling."); GR 37(h)(iii) ("[H]aving a close relationship with people who have been stopped, arrested, or convicted of a crime.").

Next, we consider, de novo, the circumstances listed in GR 37(g). The first circumstance addresses "the number and types of questions posed to the prospective juror." GR 37(g)(1). Here, Windom's counsel failed to address juror 12's inattentiveness—either directly to the juror or to the court—nor did Windom ask juror 12 any additional questions. But, neither did Windom's counsel single out juror 12 and ask them significantly more or different types of questions than other jurors, which is the second consideration.

The third consideration asks "whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge." GR 37(g)(iii). Windom's counsel did challenge other prospective jurors who were not particularly forthcoming with responses and/or had connections with law enforcement, including jurors 13, 18, and 11. The fourth circumstance looks at whether the reasons provided for the peremptory challenge "might be disproportionately associated with a race or ethnicity." GR 37(g)(iv). As noted in

GR 37(i), Windom's counsel's reasoning—inattentiveness—has historically been associated with improper discrimination in jury selection.  But, as to the fifth circumstance, no evidence exists that Windom's counsel used peremptory challenges to disproportionately strike jurors of a given race.  Windom's counsel noted that had juror 12 been stricken, another White juror would have replaced them.  Also, the final panel was apparently overwhelmingly White.[2]

We acknowledge that Windom's counsel proffered reason for using a peremptory challenge on juror 12 was subject to the restrictions of GR 37(i), but we must look at the totality of the circumstances.  When considering all the circumstances set forth in GR 37, an objective observer could not view race as a factor in Windom's counsel's use of the challenge.  Accordingly, trial court erred in granting the State's GR 37 objection.

1.  Harmless Error

Windom contends the denial of his peremptory challenge was prejudicial and the proper remedy is a new trial.  We conclude that, while the court did err, the error was harmless because Windom cannot show the outcome of the trial would have been different had the court granted his peremptory challenge.

When a peremptory challenge is erroneously denied, the harmless error standard applies.  *Booth*, 22 Wn. App. 2d at 584.[3]  Under the harmless error

---

[2]  Neither party discussed the demographic makeup of the jury in their briefs, but in his motion for a new trial, Windom noted the final panel was comprised of ten White jurors, two Asian Americans, and one Native American.

[3]  "There is no right to a peremptory challenge under either the United States Constitution or the Washington Constitution, so the erroneous loss of

15

standard, "an 'error is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.' " *Booth*, 22 Wn. App. 2d at 584 (internal quotation marks omitted) (quoting *State v. Aljaffar*, 198 Wn. App. 75, 86, 392 P.3d 1070 (2017)).

Here, Windom cannot show that the outcome of the trial would have been affected had juror 12 not been empaneled. Because juror 12 was not stricken for cause, it is assumed that they were a competent and unbiased juror. *See Booth*, 22 Wn. App. 2d at 584. Windom alleges that, because juror 12 was singled out in open court by Windom's counsel's peremptory challenge and then isolated from the other jurors, it is "within reasonable probabilities" that juror 12 would hold that against Windom. Windom contends juror 12's demeanor during testimony, such as closing his eyes, suggested as much.

We agree with Windom that a juror should be observing witness testimony, but juror 12's behavior was not inconsistent with their demeanor before Windom moved to strike them. In fact, juror 12's apparent inattentiveness was the reason for Windom's counsel's peremptory challenge in the first place, and Windom's counsel failed to inform the court and opposing counsel of it before the peremptory challenge, as required by GR 37(i).

Additionally, assuming a juror becomes hostile toward a party and error occurs every time a peremptory challenge is denied, or the juror is singled out, would lead to absurd results. A juror is presumed to follow the court's

---

peremptory challenge does not undermine the fundamental judicial process" and, therefore, is not per se reversible. *Booth*, 22 Wn. App. 2d at 581.

16

instructions and render their decision based on the facts of the case and without bias. Accordingly, it must be inferred that juror 12's role on the jury would be the same whether or not the peremptory challenge occurred. Because Windom cannot show that "within reasonable probabilities" he was prejudiced by the trial court granting the State's GR 37 objection, the error was harmless.

Prosecutorial Misconduct

Windom claims the prosecutor impermissibly exploited the racial stereotype of an "angry Black man" to undermine Windom's credibility. While the State did inappropriately comment on Windom's credibility and repeatedly referenced Windom's anger, the State's comments did not rise to the level of prosecutorial misconduct.

The prosecutor's function is twofold: (1) "enforce the law by prosecuting those who have violated the peace and dignity of the state by breaking the law," and (2) represent the people, including the defendant, "in a quasijudicial capacity in a search for justice." *State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). As a representative of the people, it is impermissible for a prosecutor "to comment on the credibility of the witnesses or the guilt and veracity of the accused." *Monday*, 171 Wn.2d at 677. But "prosecutors may argue inferences from the evidence, including inferences as to why the jury would want to believe one witness over another." *State v. Copeland*, 130 Wn.2d 244, 230, 290, 922 P.2d 1304 (1996).

A prosecutor also violates their duties, and the defendant's right to an impartial jury, when they "resort[] to racist argument and appeal[] to racial

17

stereotypes or racial bias to achieve convictions." *Monday*, 171 Wn.2d at 676. When "a prosecutor's conduct flagrantly or apparently intentionally appeal[s] to jurors' racial bias," the error is per se prejudicial and cannot be cured; therefore, the appropriate remedy is reversal. *State v. Bagby*, 200 Wn.2d 777, 803, 522 P.3d 982 (2023).

When a defendant makes a claim of race-based prosecutorial misconduct, we apply the objective observer test. *State v. Bellerouche*, 33 Wn. App. 2d 877, 895, 565 P.3d 604 (2025). The objective observer tests asks, "whether the prosecutor flagrantly or apparently intentionally appealed to racial bias in a way that undermines the defendant's credibility or the presumption of innocence." *Bagby*, 200 Wn.2d at 800. Under the standard, the court considers four elements: "(1) the content and subject of the questions and comments, (2) the frequency of the remarks, (3) the apparent purpose of the statements, and (4) whether the comments were based on evidence or reasonable inferences in the record." *Bagby*, 200 Wn.2d at 794.

Here, Windom contends the State impermissibly relied on his anger at the scene to establish he was not credible. Windom references several statements made by the State during closing argument to support his claim, including the following: "[Windom's] getting up there and he's telling lies. And we know this because Mr. Windom, he didn't do anything wrong; even the things that he admitted to. He was justified in telling those officers to fuck off, because he was angry." Later, the prosecutor stated, "[W]hat [Windom's] really saying is that he feels justified, that he did feel justified in spitting on that officer, because he had

18

been in his mind, disrespected; made angry." Windom maintains the State's attack on his credibility "risked activating deeply rooted stereotypes regarding the inherent dishonesty of Black people." (Internal quotation marks omitted.)

### 2. Content and Subject

The content and subject of the comments the prosecutor made do not flagrantly or apparently intentionally reference or allude to race. Referring to a defendant's anger to activate the stereotype of "the angry Black man" could certainly trigger a juror's implicit bias, but there is not enough here to conclude the prosecutor's conduct rose to the level of racist argument. Unlike the cases cited by Windom, the State did not make any blanket statements about Black criminal defendants, nor did the State draw attention to Windom's race or imply Windom's anger was related to race. *Cf. Monday*, 171 Wn.2d at 679 ("[T]he only reason to use the word 'po-leese' was to subtly, and likely deliberately, call to the jury's attention that the witness was African American and to emphasize the prosecutor's contention that 'black folk don't testify against black folk.'"); *Bagby*, 200 Wn.2d at 795-96 (finding prosecutorial misconduct where the State continuously referenced the defendant's nationality).

In addition, the State did not use coded language to activate bias. The State noted Windom had the right to be angry, and its use of the word "angry" in describing Windom was because "those are all of Mr. Windom's words." Windom himself discussed his anger multiple times during his testimony. Windom admitted he "was enraged" and "yelling in rage." He also testified he was happy

with the words that he used with the officers because "they didn't do their investigation right."

The prosecutor did comment on Windom's credibility when it stated, "[Windom's] getting up there and he's telling lies." Generally, the State is not allowed to comment on the credibility of the defendant, but as the trial court noted when it overruled Windom's objection, the State was arguing inferences from the evidence. The prosecutor stated that Windom "said a lot of things that just are not true," but continued to explain why the jury should find Windom was lying. It would have been more appropriate for the prosecutor to indicate why the jury should not find Windom's testimony credible, rather than allege Windom was lying, but it was not impermissible, as evidence existed to contradict Windom's testimony. *See State v. McKenzie*, 157 Wn.2d 44, 59, 134 P.3d 221 (2006) ("Where a prosecutor shows that other evidence contradicts a defendant's testimony, the prosecutor may argue that the defendant is lying.")

3. Frequency

As noted above, the State frequently referenced Windom's anger, but that was because it was the State's argument that Windom's emotional state was relevant to his intent and motive. And Windom himself referenced his anger multiple times during his testimony.

4. Apparent Purpose

The State's contention was that Windom spit on Officer Olson because he was angry. The State did not argue that Windom lied because he was angry, the State argued Windom spit on Officer Olson because he was angry and,

20

therefore, Windom was lying on the stand when he said he did not spit on Officer Olson. The purpose of discussing Windom's anger was to show why Windom had motive to spit on Officer Olson and why his testimony was not credible. Credibility was important in this case because the evidence was limited to the testimony of individuals involved in the incident.

     5.  <u>Based on the Evidence</u>

The State's comments concerning Windom's anger were based on the testimony at trial, including Windom's, and Windom's actions during the incident. Windom does not deny that he was angry; in fact, he testified that he was enraged and yelled at the officers. The State did not use Windom's anger to attack his credibility; the State permissibly discussed Windom's anger as a motive for his behavior. The State did not accuse Windom of being untrustworthy because he was angry; the State alleged Windom was untrustworthy because he had a motive to lie, and the State used instances of Windom's anger to corroborate the officers' testimony that Windom was lying about not spitting on Officer Olson. Because the State did not flagrantly appeal to the jury's bias and its arguments were based on reasonable inferences from the evidence, the prosecutor did not engage in race-based misconduct.

<u>Propensity Evidence</u>

Windom contends the trial court erred when it allowed the State to present evidence that he spit in the back of the patrol car because it was prejudicial. But, the evidence was relevant to intent and absence of mistake; therefore, it was not prejudicial and the court did not err.

21

A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). A trial court abuses its discretion when its " 'decision is manifestly unreasonable or based upon untenable grounds or reasons.' " *State v. Gunderson*, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014) (quoting *State v. Brown*, 132 Wn.2d 529, 572, 940 P.2d 546 (1997)).

Under ER 404(b),

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Evidence of other wrongs or acts is only necessary to prove intent "when intent is at issue or when proof of the doing of the charged act does not itself conclusively establish intent." *State v. Powell*, 126 Wn.2d 244, 262, 893 P.2d 615 (1995).

Before admitting evidence under ER 404(b), the court must,

"(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect."

*State v. Gresham*, 173 Wn.2d 405, 421, 269 P.3d 207 (2012) (quoting *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). The State bears the burden of establishing the first three elements. *Gresham*, 173 Wn.2d at 421. "Evidence is relevant if it makes the existence of a consequential fact more or less probable." *Brown*, 132 Wn.2d at 571. Even if the evidence is relevant, the court may exclude it if its prejudicial effect substantially outweighs its probative value.

*State v. Gantt*, 29 Wn. App. 2d 427, 447, 540 P.3d 845, *review denied*, 3 Wn.3d 1002 (2024).  When determining the probative/prejudicial balance of evidence, the trial court has considerable discretion.  *Gantt*, 29 Wn. App. 2d at 449.

In addition to the purposes set forth in ER 404(b), evidence of bad acts may also be admissible under the res gestae exception.  *Powell*, 126 Wn.2d at 263.  Evidence may be considered under the res gestae doctrine if it "complete[s] the story of the crime by establishing the immediate time and place of its occurrence."  *Brown*, 132 Wn.2d at 571.

During the motions in limine, after hearing arguments from both parties, the court found the evidence of Windom spitting in the patrol car to be relevant because it indicated Windom's intent and absence of mistake.  The court noted the evidence was prejudicial, but concluded, "with regard to this particular case, as well as the overall timeframe within which this is happening, I don't believe it's more prejudicial than probative as to those elements of the State's case."

Windom contends the court erred in admitting the evidence because evidence of him spitting in the patrol car after the charged assault was not admissible on the issue of either intent or absence of mistake.  Windom first alleges intent and mistake were not at issue because his defense was that he did not spit on Officer Olson, not that he accidentally spit on Officer Olson.  Windom cites to several cases to support his claim that intent was not of consequence, but those cases are distinguishable.  First, in *State v. Dewey*, intent was not at issue because it was not a specific element of the crime.  93 Wn. App. 50, 58, 966 P.2d 414 (1998).  In *Powell*, intent was not a disputed issue because "[p]roof

of the act of manual strangulation as well as the other evidence presented in this case established an intent to kill." 126 Wn.2d at 262

Here, intent was at issue. Even Windom's counsel recognized that the State needed to prove intent to prove assault. In his closing argument, Windom's counsel noted the State has "to prove it's not just an assault, they have to prove it was intent; two things." Windom maintains that because he did not argue the spitting was an accident, the only question for the jury is whether the assault happened, not whether it was intentional, but that argument ignores the State's burden of proving all elements of the crime, including intent.

Windom also contends the evidence was more prejudicial than probative and should not have been admitted. Windom states the jury could easily rely on the evidence of him spitting in the patrol care to make improper inferences that he was the kind of person who would spit at officers. Windom maintains whatever probative value the evidence had was cumulative of other evidence of intent, such as the officers' testimony. But the trial court properly weighed the probative/prejudicial value and noted the evidence was more probative as to the elements of the State's case, including intent and absence of mistake.

Finally, as the State argued in the motion in limine, evidence of Windom spitting in the patrol car goes to res gestae. The fact that Windom continued to spit after the incident with Officer Olson provided context to the jury concerning Windom's behavior and state of mind. The evidence "provided the jury with a more complete picture of events surrounding the crimes" committed against Officer Olson. *Brown*, 132 Wn.2d at 573. Because the evidence of Windom

spitting in the patrol car went to Windom's intent, absence of mistake, and res gestae, the trial court did not err when it determined the evidence was more probative than prejudicial and allowed it to be admitted.

The trial court erred when it sustained the State's GR 37 challenge, but the error was harmless, and Windom's other claims fail; therefore, we affirm.

_____ _, J.

WE CONCUR:

_____ Birk, J.

_____ Chung, J.